UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                                    Case No. 3:17cr55

                    Plaintiff

      v.                                                    MEMORANDUM OPINION

Gary Hill, Sr.,

                    Defendants

## I.     INTRODUCTION

Defendant Gary Hill, Sr., seeks to suppress evidence obtained through electronic surveillance of cell phones subscribed to by one of Hill's co-defendants, (Doc. No. 222), as well as statements Hill made to agents from the Federal Bureau of investigation following his arrest on February 9, 2017. (Doc. No. 275). The government opposes both motions. (Doc. No. 285). On July 5, 2018, the parties offered oral argument as to both motions, and presented testimony concerning the interactions between Hill and FBI Special Agent Kyle Fulmer on February 9, 2017. For the reasons stated below, I deny both of Hill's motions.

## II.     BACKGROUND

In 2012, FBI agents located in Ohio and Michigan began investigating the purchase and sale of heroin and cocaine in Northwest Ohio and Southeast Michigan. This investigation involved a variety of surveillance and other evidence-gathering techniques, leading up to wiretaps on phone lines associated with certain cell phones subscribed to and possessed by Larry Stewart, one of Hill's

co-defendants in this case, which were implemented pursuant to several Title III wiretap applications approved by United States District Court Judge Jack Zouhary in 2016.

On January 30, 2017, FBI agents executed a search warrant at Hill's residence in Lathrup Village, Michigan.  Hill waived his Miranda rights and answered questions posed by an agent from the Detroit FBI field office who was participating in the execution of the search warrant.  Hill agreed to consider that agent's request that Hill cooperate with the investigation, but ultimately decided he would not follow up with the agent.

On February 7, 2017, Hill and two co-defendants were indicted on one count of conspiracy to distribute controlled substances, though a grand jury subsequently returned a superseding indictment consisting of 75 counts and naming 22 defendants.  (*See* Doc. No. 17).  Hill was arrested on February 9, 2017, in Detroit, Michigan.  FBI agents transported him to the Southfield, Michigan police department, where he was interviewed a second time.  Hill again provided a statement to the agents after waiving his Miranda rights.

## III.    DISCUSSION

### A.  Motion to Suppress Title III Interceptions

Hill moves to suppress evidence obtained pursuant to the wiretaps authorized by Judge Zouhary under Title III.  In particular, he argues the affidavit provided by Agent Fulmer in support of the November 15, 2016 wiretap application fails to establish the necessity of a wiretap because the affidavit omitted certain information, overstated other information, and failed to sufficiently explain why more conventional investigatory techniques were not pursued.  (Doc. No. 222).  Hill also seeks an evidentiary hearing on this issue.

1.  *Franks* Hearing

As I stated during the July 5 hearing, Hill's assertions do not satisfy the high burden he is required to meet in order to establish his entitlement to an evidentiary hearing. A defendant is not entitled to an evidentiary hearing in connection with the defendant's challenge to a search warrant affidavit unless the defendant "1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Young*, 847 F.3d 328, 348-49 (6th Cir. 2017) (quoting *United States v. Pirosko*, 787 F.3d 359, 369 (6th Cir. 2015)).

The Sixth Circuit has "repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *United States v. Speer,* 419 F. App'x 562, 571 (6th Cir.2011) (quoting *United States v. Fowler,* 535 F.3d 408, 415 (6th Cir.2008)); s*ee also Mays v. City of Dayton,* 134 F.3d 809, 816 (6th Cir. 1998) ("except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts."(emphasis in original)).

Hill argues Agent Fulmer's affidavit omitted information previously obtained during the investigation and which was contained in an affidavit submitted with a wiretap application filed in the Eastern District of Michigan in December 2016. Hill, however, does not explain how the omitted information, even if I were to assume it is material, would have had any impact on Judge Zouhary's probable cause finding. Hill does not contend the information is exculpatory – in fact, the omitted information was cumulative and would have supported the probable-cause determination. I conclude Hill is not entitled to an evidentiary hearing.

2.  <u>Necessity</u>

Hill contends the government did not establish a wiretap was necessary because the November 15 application and accompanying affidavit prematurely disregarded more conventional investigative techniques and overstated the need for a wiretap.  More specifically, Hill argues (1) the November 15 affidavit overstated the difficulty in learning the full scope of the crime and the urgency of the need for a wiretap; (2) the affidavit omitted a significant amount of information known to the task force officers investigating Hill and other suspected members of the drug trafficking organization; and, (3) the government should have been required to first pursue additional, more-conventional methods, such as obtaining search warrants for relevant properties and conducting trash pulls and installing pole cameras at a suspected stash house in Detroit.

Title III of the Omnibus Crime Control and Safe Streets Act requires the judge reviewing the application for a wiretap determine there is probable cause to believe the wiretap will uncover evidence of a crime and the affidavit contains a "full and complete statement" that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir. 1988) (citing 18 U.S.C. § 2518(3)).  The latter requirement – often referred to as the "needs statement provision" – addresses the heightened privacy concerns associated with permitting the government to intercept all conversations transmitted over a specific line or through a specific signal:

> The needs statement provision was placed in the statute to ensure that a wiretap is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. . . . However, the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.

*United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (internal quotations and citations omitted). The government must show it has given "serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *Id.* (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)).

The November 15 affidavit did so. Fulmer described the task force's use of physical surveillance, cooperating sources, pen registers, controlled purchases, traffic stops, GPS tracking devices, and pole cameras, as well as the relative success of those methods. Fulmer also explained the task force's reasons for not employing (a) additional trash pulls (risk of detection by targets of the investigation and difficulty in identifying trash specifically discarded by one or more targets), pole cameras (targets had shown a propensity to inspect the surrounding area for cameras and difficulty in positively identifying individuals observed by the cameras), and tracking devices (inability to positively identify the people whom the targets traveled to meet); (b) additional confidential sources or undercover officers (confidential sources then in use told officers they were not in a position to get more detailed information from suspected higher-level members or to introduce undercover officers to those suspected members, and most of the suspected members were extended family or longtime friends); and (c) interviews, search warrants, and grand jury proceedings (all three methods were likely to result in all activity going dormant in an attempt to avoid detection, and the likelihood of only limited success in identifying the full scope of the organization). Fulmer also stated, based upon his experience and the close-knit relationship between the suspected members of the drug trafficking organization, it was unlikely an undercover officer could move beyond the distribution level of the organization while posing substantial danger to the officer. *See Alfano*, 838 F.2d at 164 (difficulty in placing an informant during an investigation into "a close-knit family group" sufficient reason to bypass that investigative means).

Additionally, Fulmer explained these techniques could be used more effectively in conjunction with wiretaps, as the suspected members relied heavily on phone calls and text messages to communicate with other suspected members and to arrange for transportation and distribution of the controlled substances. The information contained in the affidavit substantiates the government's contention that the wiretaps were necessary to determine how suspected members moved and sold heroin and cocaine, and to identify other suppliers and co-conspirators. *See United States v. DeJournett*, 2014 WL 3748935, at *19-21 (N.D. Ohio, July 29, 2014) (recounting various investigative methods covered by agent's affidavits, both those attempted and those rejected, and concluding the wiretaps were appropriate because the affidavits documented "past successes and specific shortcomings, and [demonstrating] why wiretaps were necessary to advance the investigation").

Moreover, while wiretap warrants must demonstrate strict compliance with the provisions of Title III, "there is no specific formula that must be met for a warrant, and . . . evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner." *Alfano*, 838 F.2d at 161 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The government is not required to exhaust all possible methods short of a wiretap, on all possible avenues, before a judge may permit the interception of electronic communications through a wiretap. *See, e.g., Giacalone*, 853 F.2d at 480.

**B. Motion to Suppress Statements**

Hill asserts he made incriminating statements during the interview with Fulmer following Hill's arrest on February 9, 2017, because Fulmer made a promise of leniency in sentencing, and therefore his statements should be suppressed as involuntary. (Doc. No. 275). There are three elements which underlie a determination that a defendant's confession was involuntary because it resulted from coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question

was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). The government must establish by a preponderance of the evidence that the defendant's confession in fact was voluntary. *Id.*

Hill asserts he only decided to talk to investigators after he was promised a reduced sentence. Hill testified that after he arrived at the Southfield police station, Fulmer told Hill that he was facing 15 years in prison. Hill responded by telling Fulmer he didn't know if he would be living in 15 years, and that he did not want to serve more than 10 years. Hill testified Fulmer replied that he would have to talk to his supervisor but that he (Fulmer) was pretty sure he could arrange that. Hill also testified that Fulmer told him that his information was worth more the sooner he provided it, and that he thought Fulmer had the authority to make the deal happen, just like a police officer during a traffic stop.

Fulmer testified that after Hill waived his Miranda rights, Fulmer told Hill that he could be facing 20 years in prison, and that it could be beneficial to Hill if Hill provided any information he had to Fulmer. Fulmer stated that, during interviews with suspects, he often refers to information as a form of currency as a means of explaining to suspects that while money cannot affect what had happened leading up to the interview, information could help the suspect moving forward. Fulmer testified he knew he had no authority to promise a specific sentence, that he did not do so, and that he made no reference to speaking to his boss about Hill's potential sentence.

I conclude Fulmer's testimony is more credible than that offered by Hill. Fulmer was consistent throughout his testimony in denying making any promises of leniency. Fulmer testified he had never made such promises to a suspect and did not do so in this case. Nor was any evidence presented that Fulmer previously had made such a promise of leniency.

On the other hand, Hill's testimony shows his recollection of the events of February 9 is not reliable. Hill testified that 30 agents pulled him over on the Lodge Freeway in Detroit, Michigan, each in separate cars, and that 12 or 14 agents were in the conference room at the Southfield police station while Fulmer interviewed him. By comparison, Hill's motion to suppress states only four agents were present.[1] (Doc. No. 275 at 1). Moreover, the idea of a coordinated traffic stop involving 30 vehicles strikes me as highly improbable.

Further, Hill has significant motivation to do anything he can to reduce his potential exposure in this case. As he conceded, Hill is in his early 60s, and a potential 20-year sentence could mean he would never leave prison. Hill previously served a 10-year sentence following his conviction on drug conspiracy and tax evasion charges, and doubtlessly was aware he now was facing a substantially longer sentence.

Having concluded that Fulmer did not promise Hill a more lenient sentence in exchange for his cooperation, I also conclude the other circumstances surrounding Hill's arrest and interrogation were not coercive and therefore the government has carried its burden of establishing Hill's statements were voluntary. *See United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997) ("The court must look at the totality of the circumstances to determine whether the defendant's will was overborne." (citing *United States v. Brown*, 557 F.2d 541, 546 (6th Cir. 1977)).

Hill was interviewed in a conference room for approximately 60-90 minutes; two agents – Fulmer and one other agent – talked with Hill during this interview. While he was taken into custody, Hill was given his Miranda rights, and acknowledges he willing waived those rights. He did not tell the agents at any time he did not want to speak with them or that he wanted to speak with

---

[1] Additionally, Hill testified he did not lie on his tax returns, as stated in the 1991 indictment, claiming his accountant falsified the returns and Hill simply took the blame for it.

an attorney. He was offered something to drink, though he declined. Hill had previous experience with the criminal justice system, including his prior drug-conspiracy conviction and his January 30 discussion with agents during the execution of the search warrant at his residence. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1069 (6th Cir. 1994) (identifying, as supportive of a finding of voluntariness, the absence of physical threats; the provision of food, drinks, and breaks in questioning; a reasonable duration of interrogation; a knowing waiver of Miranda rights; no expressed reluctance to talk; and, the absence of a request for counsel).

## IV.   CONCLUSION

Accordingly, Hill's motions to suppress are denied (Doc. No. 222 and 275).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
